UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRIAN J. SCHELL,

    Plaintiff,

  v.

ERIC SCHELLHARDT, MARC ASBURY, and
MADISON COUNTY,

    Defendants.

Case No. 19-cv-1326-JPG

## **MEMORANDUM AND ORDER**

This matter comes before the Court on the motion for summary judgment filed by municipal defendant Madison County and individual defendants Eric Schellhardt and Marc Asbury, both of whom are deputies for the Madison County Sheriff's Office (Doc. 28). Plaintiff Brian J. Schell has responded to the motion (Doc. 31), and the defendants have replied to that response (Doc. 32). This case arose after a traffic stop in which the defendants arrested Schell for resisting a peace officer. A jury acquitted him of the charge, and he now seeks compensation from the defendants for injuries he suffered connected to his arrest, which he claims was in violation of his Fourth Amendment rights and state common law rights. The parties tell substantially different stories about the incident, which the Court will leave to a jury to sort out.

**I.**    **Summary Judgment Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that

party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.  Because at this stage of the proceedings the Court must accept Schell's version of the relevant events as true, with one exception, the Court cannot grant summary judgment for the defendants.

**II.   Facts**

As noted above, the factual disputes about the incident in this case are numerous and must be viewed in Schell's favor.  Nevertheless, a critical issue is what Schellhardt and Ashbury knew at the time they stopped and arrested Schell; Schell lacks personal knowledge about much of this.  Keeping in mind the inferences that must be drawn and the requirement of a witness's personal knowledge, the evidence establishes the following relevant facts for purposes of this motion.

    A.    <u>Schell</u>

At the time the events in this case began, Schell was employed by the Illinois Department of Corrections ("IDOC") in a position that required him to possess an Illinois Firearm Owners Identification ("FOID") card.

In the fall of 2018, Schell and his wife Sandra Schell were getting divorced.  They had their last court hearing prior to the final divorce decree on September 10, 2018, and Schell was upset at Sandra after the hearing.  That evening, Schell and Sandra had a contentious phone call in which Schell said inappropriate things to Sandra, told her to tell their sons that he loved them, and threw his cell phone in anger to the passenger side of his car.  Schell was extremely sad and anxious, but not suicidal.

That evening, Schell presented at the emergency department of Memorial Hospital in Shiloh, Illinois, waited for about twenty minutes, and then left to go home and go to bed.

Personnel at Memorial Hospital reported to the Shiloh Police Department that Schell had visited and then left, and that he had said he was suicidal. The incident at issue in this case occurred on Schell's drive home a little after 1:00 a.m. on September 11, 2018.

B.  Schellhardt and Asbury

In the meantime, Sandra's phone call with Schell led her to believe that Schell was in distress, could harm himself, and might be saying his final good-bye to his children. She also believed the noise when Schell threw his phone across the car might have been a gunshot. Immediately after the call, Sandra called Schell's mother, then 911 to request a wellness check to make sure Schell did not need assistance. She told the 911 dispatcher that Schell had said he was going to end his life, that she had heard a possible gunshot on the phone, and that Schell owned guns. She described his car, his residence, and another piece of real property he owned.

Independent of Sandra's call, a Highland police officer alerted the 911 dispatcher that Schell had gone to Memorial Hospital but had left. The officer requested that an Illinois State Police Emergency Radio Network ("ISPERN") broadcast be put out to all local law enforcement agencies to try to locate Schell because he was believed to be suicidal. The ISPERN broadcast was issued and included information that Schell was suicidal, owned multiple guns, had an active concealed carry license, worked for IDOC, was a well-trained martial artist, and had presented to Memorial Hospital earlier that evening.

A little after 1:00 a.m. on September 11, 2018, Schellhardt, Asbury, and Madison County Sheriff's Patrol Sergeant Christopher Brindley were dispatched to perform a wellness check on Schell. They were informed by the dispatcher and had learned from the ISPERN broadcast that Schell was suicidal and might be in possession of a firearm. Brindley also told Schellhardt and Asbury that he was familiar with Schell and that they should use caution because Schell had

professional mixed martial arts fighting experience and had been trained in firearms and IDOC defensive tactics. Brindley also told the deputies that Schell had been "less than cooperative" during a previous contact with the Sheriff's Office when deputies reported to Schell's home in response to a domestic issue. The dispatcher also informed Schellhardt that Schell had just left Memorial Hospital after reporting that he was suicidal, that he had sent a good-bye message via Sandra to his children, and that Sandra believed she had heard a gunshot on the phone with Schell. Based on this information, Schellhardt formed the impression that Schell was in possession of a gun. Schellhardt spotted Schell's car and reported the location to Asbury and Brindley, who were driving separate cars. Asbury reported to that location and started following Schellhardt's car as it was following Schell. Schellhardt also requested assistance from the Troy Police Department because he thought Schell was armed.

Schellhardt and Asbury both activated their emergency lights, but Schell did not stop, so Schellhardt also activated his siren. Schellhardt was trying to pull Schell over not because he had reason to believe Schell had committed a crime but solely to conduct a wellness check to make sure Schell was not a danger to himself or others.

    C.        <u>Encounter between Schell and the Defendants</u>[1]

While he was driving home a little after 1:00 a.m. on September 11, 2018, Schell saw Schellhardt's unmarked squad car behind him. He saw the car's police lights on but he did not hear the siren. He wondered why he was being pulled over since he had not disobeyed any traffic rules. It took Schell a minute to find a place to pull over safely because the road was beside a ditch with not much of a shoulder. Schellhardt pulled his car behind Schell's, but Schell

---

[1] Schell and the defendants have significantly different recollections of these events, but, as it must on summary judgment, the Court takes Schell's version as true.

was unable to see the officer because of the bright lights from the police car.  Another officer pulled beside Schellhardt blocking the lane of oncoming traffic.

Once Schell and the deputies had stopped, Schellhardt gave orders over the squad car speaker for Schell to turn off his engine, roll down his window, throw his keys out of the window, and place his hands outside the window.  Schell was playing his radio loudly so he did not hear the command at first, but when he turned his radio down, he heard something muffled, so he rolled down his window to hear what was being said.  He placed his hands out the window to block the bright lights from the squad cars reflected in his side mirror.  Schell never heard anyone instruct him to throw his car keys out.

Schellhardt then instructed Schell to get out of his vehicle.  Schell stepped out so he was standing in the open doorway of his car raising his hands in the air.  He saw three officers present.  He did not begin to move away from the car; he just stood still and asked—without using profanity—why he had been pulled over.  Schellhardt told him to shut up and put his hands in the air.  Based on the officers' stance, Schell believed they were pointing guns at him, although he could not see the guns because of the bright lights.

When Schell had gotten out of his car, he had inadvertently failed to shift the gear into "park," and as he was standing outside the car, it begin to roll forward.  Schellhardt yelled at him to get back in and put it in "park."  While this exchange was occurring, Troy Police Officer Justin Christ arrived and recorded the events on his squad car's dashboard camera.  Schell lowered his hands, got back in the car, shifted it to "park," and then stepped out with his hands up again and remained in the open doorway of his car.

Asbury approached Schell with handcuffs, and Schellhardt instructed Schell to turn around to be cuffed.  Schell knew he was going to be cuffed and did not resist or jerk his arms

5

away from Asbury. He put his left hand on top of his car and his right hand behind his back for the cuffs. Asbury placed Schell's right hand in the cuffs and began to turn Schell around to cuff his left hand. Schell had started to tell Asbury he had just had rotator cuff surgery on his left shoulder when Schellhardt used a taser on him. Schell immediately fell to the ground face first flat on his stomach with his uncuffed left hand underneath him. Asbury was concerned that Schell was reaching for a firearm and was concerned for the deputies' safety. Officers yelled at Schell to place his left hand behind his back, but he was unable to move and had no control over his arms from the debilitating effects of the taser. As soon as Schell started regaining his abilities—and very soon after the first tasing—Schellhardt tased him a second time because he had not yet placed his left hand behind his back for cuffing. After the second tasing, Asbury was able to complete handcuffing him. When Schell asked Schellhardt why he has used the taser, Schellhardt answered that Schell was a big guy.

  D.  <u>Collateral Consequences</u>

Later in the day of September 11, 2018, Schellhardt and the Sheriff of Madison County recommended to the Illinois State Police that it revoke Schell's FOID card because he posed a clear and present danger to himself and others. In support of that recommendation, they attached a copy of Schellhardt's incident report which set forth his version of the relevant events. Those differed substantially from Schell's version as described above. The Illinois State Police revoked Schell's FOID card. Additionally, Schellhardt filed a criminal complaint against Schell, which led to a charge of resisting a peace officer in violation of 720 ILCS 5/31-1. The charge was based on Schell's alleged jerking his hands away when Asbury was first trying to handcuff him and on Schell's failure to place his hands behind his back when ordered to do so while he was lying on the ground after the first tasing. A jury acquitted him of the charge in October 2019.

In the meantime, as a consequence of the incident, IDOC placed Schell on administrative leave with lower pay and then discharged him effective in June 2019. He was able to regain employment with IDOC in April 2020 after grieving his discharge, being acquitted of the criminal charge, and getting his FOID card back, although he lost his seniority and was unable to return to his former position.

E.     This Litigation

Schell filed this lawsuit in December 2019 asserting claims against Schellhardt for false arrest for resisting a peace officer in violation of the Fourth Amendment (Count I), malicious prosecution in violation of state law (Count II), and excessive force by handcuffing and using a taser twice in violation of the Fourth Amendment (Count III); against Asbury for false arrest for resisting a peace officer in violation of the Fourth Amendment (Count IV); and against Madison County for indemnification for the conduct of Schellhardt and Asbury (Count V). Importantly, Schell does not assert that the deputies did not have sufficient justification for the initial stop to conduct a wellness check, so the Court focuses on what happened after Schellhardt pulled Schell over and whether those events justified the level of force used, an arrest for resisting a peace office, and prosecution on that charge.

The defendants urge the Court to grant summary judgment on a variety of grounds. First, they argue that the initial stop was objectively reasonable in light of the community caretaking doctrine. Second, the defendants argue that the force Schellhardt used was objectively reasonable. Third, they argue that, in light of Schell's conduct, they had probable cause to arrest him for resisting a peace officer and did not maliciously prosecute him by instigating the charge against him. Finally, they contend that they are entitled to qualified immunity. For its part, Madison County argues that because Schellhardt and Asbury are not liable, they cannot be liable

for to indemnify for the deputies' conduct.

### III.   Analysis

#### A.   Initial Stop

The defendants seek summary judgment on a claim that the initial stop of Schell to conduct a wellness check was not justified. A vehicle stop, even simply to conduct a wellness check, is a seizure. The law is clear that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Brendlin v. California*, 551 U.S. 249, 254 (2007) (recognizing that a seizure occurs whenever law enforcement intentionally use physical force or a show of authority to restrain an individual's freedom of movement). However, as noted above, Schell is not challenging the stop itself, so this argument addresses a claim that Schell has not made. Instead, Schell challenges the manner of restricting his personal physical movement *after* his vehicle was initially stopped and his arrest for resisting a peace officer.

#### B.   Excessive Force (Count III)

Schellhardt argues that his participation in the handcuffing of Schell and the use of a taser to facilitate that handcuffing was objectively reasonable in light of Schell's refusal to obey commands, including the command to place his hands behind his back to be cuffed.

The Fourth Amendment forbids seizures, including arrests, investigatory stops, or other seizures of a free citizen, that are unreasonable because they involve the use of excessive force. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). To determine whether unreasonable force was used, the Court must balance the level of law enforcement's "intrusion on the individual's Fourth Amendment interests against its

promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). The Court must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The test is an objective reasonableness test; that is, the situation should be evaluated from the point of view of a reasonable officer on the scene rather than in 20/20 hindsight. *Id.* The officer's "use of force is unconstitutional if, judging from the totality of the circumstances at the time of the [seizure], the officer used greater force than was reasonably necessary to make the [seizure]." *Chelios v. Heavener*, 520 F.3d 678, 689 (7th Cir. 2008) (internal quotations omitted).

The Court first turns to the decision to restrain Schell using handcuffs. In the context of executing a valid search warrant, "detention represents only an incremental intrusion on personal liberty" while the search is conducted. *Michigan v. Summers,* 452 U.S. 692, 703 (1981); *see Muehler v. Mena*, 544 U.S. 93, 98-100 (2005). Temporary detention also prevents flight, minimizes harm to law enforcement officers, and facilitates an orderly search. *Summers*, 452 at 702-03; *Mena*, 544 U.S. at 98. The Court believes the balance is similar for traffic stops to conduct wellness checks on individuals reasonably believed to be armed and suicidal.

Here, it is true that Schell was not suspected of committing a crime, but a reasonable officer in Schellhardt's position would have believed that Schell posed an immediate threat to himself and the officers on the scene. Information from the dispatcher and from Brindley painted a picture of a suicidal, armed man who was skilled in physical combat. Whether the information was true was irrelevant, for it was what Schellhardt had been informed and reasonably believed was true. A reasonable officer would believe that, in the circumstances

9

known to Schellhardt, it was necessary to take the simple precaution of placing Schell in handcuffs—an "incremental intrusion on personal liberty"—while law enforcement officers checked for nearby weapons and assessed Schell's dangerousness and need for medical attention. Thus, the decision to seize Schell by placing him in handcuffs was not, by itself, unreasonable and did not constitute excessive force.

The use of the taser to facilitate the handcuffing is a different story. Using a taser to disable an individual presents a much greater intrusion on personal liberty than simply handcuffing the individual. Additionally, the parties have vastly different views about the handcuffing process. Taking Schell's version as true, he was not aggressive, was compliant with law enforcement orders to submit to handcuffing, was resigned to being handcuffed, and never showed any physical resistance to the cuffing. In such circumstances, a reasonable jury could find that Schellhardt's use of a taser even once was more force than was necessary to restrain Schell in handcuffs. Therefore, the Court cannot grant summary judgment in Schellhardt's favor on this facet of Count III.

    C.    <u>Probable Cause (Counts I and IV)</u>

Schellhardt and Asbury maintain that they had probable cause to arrest Schell for resisting a peace officer. "Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." *Muhammad v. Pearson*, 900 F.3d 898, 907 (7th Cir. 2018) (internal quotations omitted). Probable cause is determined by considering the totality of the circumstances:

> [A] law enforcement officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense. . . . So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part,

probable cause exists.

*United States v. Sawyer*, 224 F.3d 675, 678-79 (7th Cir. 2000) (internal citations omitted); *accord Muhammad*, 900 F.3d at 908. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

The defendants assert they had probable cause to arrest Schell for resisting a peace officer in violation of Illinois law, 720 ILCS 5/31-1. That statute makes it a misdemeanor to "knowingly resist[] or obstruct[] the performance by one known to the person to be a peace officer . . . of any authorized act within his or her official capacity." The resistance must be a physical act, not just verbal resistance or argument with an officer. *People v. McCoy*, 881 N.E.2d 621, 630 (Ill. App. Ct. 2008).

No doubt, if everything had happened the way the defendants describe the roadside encounter with Schell, they would likely have had probable cause to arrest him for physically resisting a peace officer. However, on summary judgment, the Court relies on Schell's version of the facts—including that he was respectful, obedient, and not at all resistant physically or verbally—not the defendants'. And Schell's version of the events is not so blatantly belied by the video from Christ's dash cam that no reasonable jury could believe his version.[2] Therefore, the defendants are not entitled to summary judgment on Counts I and IV.

D.     Malicious Prosecution (Count II)

Schell charges that Schellhardt pursued the misdemeanor charge against him by drafting a false police report, by filing a false criminal complaint, and by otherwise providing false

---

[2] The Court has carefully and repeatedly reviewed the dash cam video and finds it may be subject to different interpretations by reasonable jurors.

11

information to, and concealing exculpatory information from, the State's Attorney, the person who decided to bring the charge. Schell asserts this amounts to malicious prosecution under Illinois law. The elements of the tort of malicious prosecution under Illinois law are:

> (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.

*Beaman v. Freesmeyer*, 131 N.E.3d 488, 495 (Ill. 2019) (internal citations and quotations omitted); *accord Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). Schellhardt asks for summary judgment on the grounds that Schell cannot prove the third and fourth elements—lack of probable cause and presence of malice.

As with Count I, Schellhardt argues that he had probable cause to arrest Schell. However, as discussed above, accepting Schell's version of the events, a reasonable jury could find the absence of probable cause to pursue the criminal charge of resisting a peace officer.

And because accepting Schell's version of events as true would necessarily mean that Schellhardt had fabricated his version of events—this is hardly a case where Schell and Schellhardt merely perceived or remember things differently—the Court believes a reasonable jury could find Schellhardt instigated Schell's prosecution for an improper motive, say, to justify a questionable use of force on a totally cooperative individual. This would satisfy the fourth element of malice, which can be inferred from prosecution without probable cause. *Beaman v. Freesmeyer*, No. 125617, 2021 IL 125617, ¶ 141, 2021 WL 3204481, at *19 (Ill. July 29, 2021), *reh'g denied* (Ill. Sept. 27, 2021).

Simply put, a reasonable jury could find Schellhardt committed malicious prosecution when he conveyed a fictitious version of events to the State's Attorney, which led to the charge against Schell. For this reason, Schellhardt is not entitled to summary judgment on Count II.

E.      Qualified Immunity

Finally, the Court addresses the defense of qualified immunity to Schell's § 1983 claims. Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects an official from suit "when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the plaintiff, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232; *see Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

If the plaintiff can prove a constitutional violation, which the Court has held Schell may be able to do, the Court must determine whether the right was sufficiently clear at the time of the violation that a reasonable official would have understood that what he was doing violated that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Brosseau*, 543 U.S. at 199; *Wilson*, 526 U.S. at 609. The inquiry must be made focusing on the specific context of the case, not at a high level of generality. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "[T]he clearly established law must be 'particularized' to the facts of the case. Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* at 552 (quoting *Anderson*, 483 U.S. at 639, 640; internal citations omitted).

The plaintiff bears the burden of demonstrating that a constitutional right is clearly established. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). To determine whether the right was clearly established, this Court looks to Supreme Court and Seventh Circuit Court of Appeals decisions, then, if there is no controlling precedent, to all relevant caselaw to determine if there is a clear trend suggesting recognition of the right is inevitable. *Gill*, 850 F.3d 335, 341 (7th Cir. 2017). "Qualified immunity is dissolved, however, if a plaintiff points to a clearly analogous case establishing a right to be free from the specific conduct at issue or when the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chi.*, 242 F.3d 737, 742 (7th Cir. 2001).

Were this a more nuanced case, the Court could readily say that Schell has not carried his burden of proving clearly established law; he does not cite any Supreme Court or Seventh Circuit cases with a similar fact pattern. However, this is not a nuanced case. Schell testified he was cooperative and compliant, and the relevant, although generalized, false arrest and excessive force principles of law were abundantly clear on September 11, 2018. No reasonable officer could possibly believe the use of a taser on a cooperative individual was necessary, and no reasonable officer could believe that the cooperative individual had unlawfully resisted arrest. Therefore, the defendants are not entitled to qualified immunity.

      F.      <u>Madison County (Count V)</u>

Madison County's argument in support of summary judgment is premised on judgment being granted for Schellhardt and Asbury. However, since the Court has not disposed of the claims against the deputies, there is no basis for granting summary judgment for Madison County.

**IV.     Conclusion**

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** the defendants' motion for summary judgment (Doc. 28) as follows:
    - The motion is **GRANTED** on Schell's excessive force claim (Count III) to the extent it relies on the defendants' decision to restrain Schell in handcuffs;
    - The motion is **DENIED** in all other respects; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED:  November 29, 2021**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
